IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLENN HILL and CASEY BAKER, and all others similarly situated,<br><br>      Plaintiffs,<br><br>   v.<br><br>R+L CARRIERS, INC.; R+L CARRIERS SHARED SERVICES, LLC,<br><br>      Defendants. | No. C 09-1907 CW<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (Docket No. 236), GRANTING DEFENDANT'S MOTION TO DE-CERTIFY CONDITIONALLY CERTIFIED COLLECTIVE ACTION (Docket No. 249), AND DENYING AS MOOT DEFENDANT'S MOTIONS TO EXCLUDE (Docket No. 231) AND TO STRIKE (Docket No. 270) |

Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs Glenn Hill and Casey Baker move to certify a class of Defendant R+L Carriers Shared Services, LLC's current and former California employees to prosecute claims related to alleged violations of state wage-and-hour laws.[1] Defendant opposes Plaintiffs' motion and moves to de-certify the collective action that was conditionally certified under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b). Plaintiffs oppose Defendant's de-certification motion. Defendant also moves to exclude Robert Koenegstein and Russell Weitzel as class members. Finally, Defendant objects to and moves to strike portions of paragraphs in the Nelson Declaration filed in support of Plaintiffs' motion for

---

[1] On November 9, 2009, R+L Carriers, Inc., was dismissed from this action for lack of personal jurisdiction. (Docket No. 46.) Defendant R+L Carriers Shared Services, LLC, is the only Defendant remaining in this action.

class certification and in opposition to Defendant's motion for de-certification.[2] The motions were heard on December 23, 2010. Having considered oral argument and the papers submitted by the parties, the Court DENIES Plaintiffs' motion for class certification, GRANTS Defendant's motion to de-certify the FLSA collective action and DENIES as moot Defendant's motions to exclude and to strike.

## BACKGROUND

Defendant provides operations and administrative employees to related entities that transport freight. The parties' motions concern Defendant's former and current dispatchers who work at its shipping terminals.

For the purposes of their motion, Plaintiffs categorize these employees as either "pure" or "hybrid" dispatchers. Although both types of employees perform dispatching duties, "hybrid" dispatchers may also load and unload Defendant's trucks during their shifts. Irrespective of their classification, these employees generally work no fewer than ten hours per day. White Decl., Ex. A, Wyrick Depo. 64:5-6.

The "pure" dispatcher category is comprised only of City Dispatchers, who are also referred to as First Shift Supervisors/City Dispatchers. These dispatchers are generally assigned to the first of three shifts at Defendant's terminals. The first shift apparently begins between 6:00 and 7:00 a.m. and

---

[2] Defendant's filing of evidentiary objections in a separate brief violates Civil L.R. 7-3, which requires that such objections be contained within its reply brief. In the future, such a filing will be stricken from the docket.

2

ends between 4:00 and 5:00 p.m.³  See, e.g., Hill Decl. ¶ 5; Saucedo Decl. ¶ 5.  These dispatchers manage and direct the pickups and deliveries within a terminal's local area.  See, e.g., White Decl., Ex. G, Tejera Depo. 23:18-20; Camacho Decl. in Support of Def.'s Mot. for Summ. J. ¶ 6.  Hill worked as a City Dispatcher in Defendant's San Leandro terminal.

The "hybrid" dispatcher category consists of dispatchers who staff the second and third shifts.  These dispatchers hold one of the following job titles: Router/Dispatchers-Outbound, Dispatcher/Outbound Supervisors, Router/Dispatcher Supervisors, Dispatcher/Supervisors, Router Dispatchers-Inbound and Dispatcher/Inbound Supervisors.  In addition to their dispatching duties, dispatchers working the second shift, who appear to be the Router/Dispatchers-Outbound and Dispatcher/Outbound Supervisors, are responsible for managing line-haul shipments, which are destined for Defendant's hubs or terminals outside of the terminal's local area.  See, e.g., White Decl., Ex. A, Wyrick Depo. 60:3-6; id., Ex. L, Haggard Depo. 20:24-21:5.  Dispatchers working the third shift, who appear to be the Router Dispatchers-Inbound and Dispatcher/Inbound Supervisors, manage freight delivered to the terminal.  They assign deliveries to and create routes for Defendant's drivers who make deliveries within the terminal's local area.  See, e.g., White Decl., Ex. A, Wyrick Depo. 167:21-170:14; Camacho Decl. in Support of Def.'s Mot. for Summ. J. ¶ 8.  Toward the end of their shifts, third-shift dispatchers meet with City

---

³ At least one City Dispatcher, however, worked hours that spanned the first and second shifts.  White Decl., Ex. G, Tejera Depo. 23:18-20.

3

1  Dispatchers to discuss the local delivery assignments for the day.
2  See, e.g., Camacho Decl. in Support of Def.'s Mot. for Summ. J. ¶
3  8.  Some dispatchers, such as Dispatcher/Supervisors, perform tasks
4  of both second- and third-shift dispatchers.

5      The duties of a second- and third-shift dispatchers may depend
6  on the size of a terminal.  See, e.g., White Decl., Ex. A, Wyrick
7  Depo. 53:14-22 (agreeing with Plaintiffs' counsel that third-shift
8  dispatchers "at the smaller terminals become essentially jacks-of-
9  all-trades"), 60:18-23 (stating that second-shift dispatchers in a
10 "smaller location" may "spend more time in dispatch").  Also, in
11 some terminals, a single dispatcher may perform tasks that, in
12 other terminals, would be assigned to dispatchers working different
13 shifts.  For instance, Baker, who was a Dispatcher/Supervisor,
14 performed the duties of a City Dispatcher, second-shift dispatcher
15 and third-shift dispatcher.  Another example is opt-in Plaintiff
16 Tejada, whose regular hours spanned the first and second shifts and
17 entailed a combination of duties related to those shifts.  White
18 Decl., Ex. G, Tejera Depo. at 22:22-24:22.

19     Plaintiffs allege Defendant misclassified them as exempt from
20 federal and state overtime pay requirements.  They also allege
21 Defendant did not allow California dispatchers to take meal and
22 rest breaks and did not provide proper wage statements.  Plaintiffs
23 bring claims for violations of the FLSA, California's wage-and-hour
24 laws and California's Unfair Competition Law (UCL).

25     On January 22, 2010, the Court denied Defendant's motion for
26 summary judgment after concluding that there are issues for trial
27 concerning whether Defendant properly classified Hill as exempt
28 from overtime pay requirements.  The Court also conditionally

*United States District Court*
*For the Northern District of California*

4

certified this lawsuit as a FLSA collective action. See 29 U.S.C. § 216(b). Notice was sent to a class defined as "everyone who worked at R+L Carriers as a City Dispatcher, First Shift Supervisor/Dispatcher, Inbound Supervisor/Dispatcher, Outbound Supervisor/Dispatcher, or in any other Dispatcher positions for any period of time since January 22, 2007, and who were not paid overtime." Order of January 22, 2010, Ex. A at 3. On June 17, 2010, Hill filed consent-to-join notices from fifty-one individuals purporting to be part of the conditionally certified FLSA class.

On October 25, 2010, the Court granted Hill leave to file a second amended complaint to add Opt-in Plaintiff Casey Baker as a named Plaintiff and class representative.

DISCUSSION

I. Defendant's Motion to De-Certify FLSA Action

A. Legal Standard

The FLSA authorizes workers to sue for unpaid overtime wages on their own behalf and on behalf of "other employees similarly situated." 29 U.S.C. § 216(b). Unlike class actions brought under Federal Rule of Procedure 23, collective actions brought under the FLSA require that individual members "opt in" by filing a written consent. Wang v. Chinese Daily News, Inc., 623 F.3d 743, 761 (9th Cir. 2010) (citing 29 U.S.C. § 216(b)).

The FLSA provides for a collective action where the complaining employees are "similarly situated." 29 U.S.C. § 216(b). The FLSA does not define "similarly situated," nor has the Ninth Circuit defined it. As noted by the Tenth Circuit, there is little circuit law defining "similarly situated." Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001).

5

1   Although various approaches have been taken to determine
2 whether plaintiffs are "similarly situated," district courts in
3 this circuit have used the ad hoc, two-step approach. See, e.g.,
4 Harris v. Vector Mktg. Corp., ___ F. Supp. 2d ___, 2010 WL 4588967
5 (N.D. Cal.); Reed v. Cnty. of Orange, 266 F.R.D. 446 (C.D. Cal.
6 2010); Wynn v. Nat'l Broad. Co., Inc., 234 F. Supp. 2d 1067, 1082
7 (C.D. Cal. 2002) (noting that the majority of courts prefer this
8 approach); see also Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d
9 1208, 1219 (11th Cir. 2001) (finding the two-step approach to
10 certification of § 216(b) opt-in classes to be an effective tool
11 for district courts to use).  The Court has already undertaken the
12 first step, which entails considering whether a putative class
13 should be conditionally certified for the purposes of sending
14 notice of the action to potential class members.  See, e.g.,
15 Thiessen, 267 F.3d at 1102; Harris, 2010 WL 4588967, at *4.

16   The second step is made at the conclusion of discovery,
17 usually on a motion for de-certification by the defendant,
18 utilizing a stricter standard for "similarly situated." Thiessen,
19 267 F.3d at 1102.  During this second-stage analysis, courts review
20 several factors, such as (1) the disparate factual and employment
21 settings of the individual plaintiffs; (2) the various defenses
22 available to the defendant which appear to be individual to each
23 plaintiff; (3) fairness and procedural considerations; and
24 (4) whether the plaintiffs made any required filings before
25 instituting suit.  Id. at 1103.

26   As noted, collective actions under the FLSA are not subject to
27 the requirements of Rule 23 of the Federal Rules of Civil Procedure
28 for certification of a class action.  Id. at 1105.  Courts have

United States District Court
For the Northern District of California

held that FLSA's "similarly situated" standard is less stringent than Rule 23(b)(3)'s requirement that common questions of law and fact predominate. See, e.g., O'Brien v. Ed Donnelly Enters., Inc., 575 F.3d 567, 584-87 (6th Cir. 2009); Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996). "All that need be shown by the plaintiff is that some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA." Wertheim v. Arizona, 1993 WL 603552, at *1 (D. Ariz.) (citations omitted). "Showing a 'unified policy' of violations is not required." O'Brien, 575 F.3d at 584.

The lead plaintiffs in a FLSA collective action have the burden of showing that the opt-in plaintiffs are situated similarly to them. Id.

B.  Analysis

In their opposition to Defendant's de-certification motion, Plaintiffs "clarify" that their FLSA collective action consists of only City Dispatchers. This set of employees is much narrower than the group notified pursuant to the Court's conditional certification order. As noted above, the Court authorized notice to all dispatchers, including "hybrid" dispatchers, who had worked for Defendant since January 22, 2007 and not been paid overtime. Plaintiffs exclude "hybrid" dispatchers from the proposed FLSA collective action, stating that discovery revealed these dispatchers to be properly classified as exempt from overtime pay requirements under the federal Motor Carrier Exemption, 29 C.F.R. § 782.2(a).

7

Defendant argues that this concession, on its own, warrants de-certification of the FLSA collective action in its entirety. This argument sweeps too broadly. If some opt-in plaintiffs are not situated similarly to the lead plaintiff, the most efficient course may be to grant the defendant's de-certification motion in part, dismiss the non-conforming opt-in plaintiffs' claims without prejudice and narrow the scope of the FLSA collective action. See, e.g., Dice v. Weiser Sec. Servs., Inc., 2008 WL 249250, at *1 (S.D. Fla.) (creating a subclass of opt-in plaintiffs who were situated similarly to the named plaintiff) (citing King v. Koch Foods of Miss., LLC, 2007 WL 1098488, at *4 (S.D. Miss.)); cf. Wren v. RGIS Inventory Specialists, 256 F.R.D. 180, 212-13 (N.D. Cal. 2009) (granting de-certification motion in part by limiting claims brought by the FLSA opt-in plaintiffs). District courts have discretion in managing FLSA collective actions. See Thiessen, 267 F.3d at 1105. Judicial efficiency would not be served by dismissing the claims of the opt-in plaintiffs who are situated similarly to the named plaintiff simply because other opt-in plaintiffs are not so situated.

To proceed with a collective action here, opt-in Plaintiffs who have worked as City Dispatchers must be situated similarly to Hill, who was a City Dispatcher.[4] However, a comparison of Hill's circumstances with those of other opt-in Plaintiffs shows a lack of similarity that precludes adjudication of this case as a FLSA collective action.

---

[4] Plaintiffs concede that Baker, a "hybrid" dispatcher, was exempt from federal overtime pay requirements. Thus, Baker does not appear to have a claim under FLSA concerning overtime pay.

8

1    Hill represents that he had very little discretion in
2 performing his job. He states that he adhered closely to the
3 Terminal Services Operations Manual (TSOM) and could not deviate
4 from it. He also indicates that he was required to seek approval
5 from the terminal manager to perform several actions, including
6 adjusting drivers' start times, bringing in drivers to replace
7 regularly-scheduled drivers who were not able to work, or
8 reassigning pick-ups and or deliveries in the event that a driver's
9 truck broke down. Hill Decl. ¶¶ 30, 33 and 39. He represents that
10 he played a very limited role on personnel matters: he never
11 participated in employee hiring and, if he believed that an
12 employee required discipline, he had to notify the terminal
13 manager. Id. ¶¶ 21 and 23-24. He states that he "never met with
14 drivers before the start of their work shifts" or provided them
15 with training. Id. ¶¶ 26 and 28. At his deposition, Hill stated
16 that he constantly asked the terminal manager questions; in the
17 event that the terminal manager was not available, Hill was
18 instructed to contact the manager of another terminal. White
19 Decl., Ex. D, Hill Depo. 112:3-16.
20    Hill's experience contrasts with that of opt-in Plaintiff
21 Dennis Gaitley, who works as a City Dispatcher in New Jersey.
22 Gaitley exercises more discretion in his job than Hill did. At his
23 deposition, Gaitley testified that, when the terminal manager is
24 not present, he is expected to assume responsibility for the
25 operations of the terminal and to make decisions on his own. See
26 also White Decl., Ex. H, Gaitley Depo. 43:3-5 ("You can't run to
27 the Terminal Manager for every decision or what would I be there
28 for."). Gaitley also represented that he provides trainings,

9

either to new employees or at monthly safety meetings.  Id. 69:24-70:10 and 74:16-21.  He also testified that he has assisted in interviewing driver candidates.  Id. at 137:20-25.  With respect to the TSOM, Gaitley opined that it was "just a manual telling a new employee how they expect them to function under R+L's guidelines."  Id. at 108:16-20.

Both Hill's and Gaitley's experiences appear to differ from those of opt-in Plaintiff Carlos Tejera, who was a City Dispatcher at Defendant's Atlanta terminal.  Unlike Hill or Gaitley, Tejera was not aware of the TSOM and, in direct contrast to Hill, Tejera testified that he did not use the TSOM to perform his duties.  White Decl., Ex. G, Tejera Depo. 116:8-16.  And, unlike Gaitley but like Hill, Tejera did not attend or assist with monthly safety meetings.  Tejera also apparently had more discretion than Hill, but less than Gaitley.  For instance, when a driver's truck suffered a breakdown, Tejera consulted with the terminal manager and participated in making reassignment decisions.  See id. 92:22-93:14.  In contrast, Hill was instructed "specifically which truck to re-assign the driver to, and which trucks to re-distribute original load to."  Hill Decl. ¶ 39.

Finally, opt-in Plaintiff Allan Holleman, who was a City Dispatcher in Indiana, had limited discretion like Hill and was required to seek the terminal manager's approval before making many decisions.  Unlike Hill, however, Holleman played a more active role in personnel decisions, making suggestions and recommendations with regard to hiring decisions.  White Decl., Ex. I, Holleman Depo. 61:15-20.  But in contrast to Gaitley, Holleman did not interview candidates.  Id. at 80:22-81:2.  Also, Holleman did not

appear to rely heavily on the TSOM; he said that, although he was aware of it, he did not consult it in the performance of his day-to-day activities.  Id. at 68:7-15.

All of this indicates that the circumstances of each City Dispatcher's employment situation differed, which would require an individual inquiry into whether each of them was properly classified as exempt.  Defendant intends to assert defenses based on the administrative and executive employee exemptions.  See generally 29 C.F.R. §§ 541.200 and 541.100.  The requirements of the administrative exemption alone evince the necessity of individualized inquiries in this case.  That exemption requires an inquiry into whether an employee's primary duty entailed the "performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and included the "exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(2)-(3).  As described above, some City Dispatchers exercised more discretion than others.  An investigation of the degree of each opt-in Plaintiffs' exercise of discretion would prove too unwieldy at trial.

Plaintiffs point to Defendant's witnesses' testimony that dispatchers should be performing the same job and that dispatchers' primary job is dispatching.  Specifically, they point to the testimony of William Gaines, one of Defendant's former vice presidents, who compared City Dispatchers to McDonald's fries to suggest that each "dispatcher should be doing the same job in every terminal."  Nelson Decl. in Support of Mot. for Class Certification, Ex. 13, Gaines Depo. 85:13-25.  They also cite the

11

testimony of Courtney Wyrick, one of Defendant's current vice presidents, who agreed with Plaintiffs' counsel's statement that a City Dispatcher would be performing "pretty much the same exact job as a city dispatcher at another similarly sized terminal." Id., Ex. 7, Wyrick Depo. 23:24-24:5.  However, these statements are not inconsistent with the differences raised above.  That City Dispatchers should be performing the same job as City Dispatchers in similarly-sized terminals does not necessarily mean that they are in fact doing so.  Furthermore, the size of Defendant's terminals varies, which leads to differences in duties.  Indeed, Gaines stated that City Dispatchers in "smaller terminals" have "dual duties," performing the tasks of both a City Dispatcher and third-shift supervisor.  Id., Ex. 13, Gaines Depo. 86:20-25.

    Plaintiffs also argue that the primary job of each dispatcher is dispatching and, thus, they are all situated similarly. Specifically, they point to employees' declarations collected by Defendant, which state that their primary duty was "to manage and direct the pickups and deliveries made by [Defendant's] Drivers." See, e.g., Camacho Decl. in Support of Def.'s Mot. for Summ. J. ¶ 6; Kardiban Decl. in Opposition to Pl.'s Mot. for Conditional Certification ¶ 5.  However, these statements do not define "manage" or "direct."  Nor do they establish that, in fulfilling their duties, all City Dispatchers exercised only a limited amount of discretion or performed only non-exempt tasks.

    Plaintiffs also point to the TSOM, asserting that it governs how all City Dispatchers perform their jobs.  Even if this were true, Plaintiffs offer no evidence that it limits what City Dispatchers may do.  And, as noted above, it is not apparent that

12

City Dispatchers uniformly use the TSOM; although Hill apparently relied on it, Tejada had never heard of it.  Further, Wyrick testified that the TSOM offers only guidelines on how City Dispatchers should perform their jobs.  See White Decl., Ex. A, Wyrick Depo. 20:8-15; see also id. at 22:14-21 ("The manual is a guideline.  There are circumstances that happen every day that decisions have to be made by personnel in a location that may be different than what is actually written and stated in the manual.").  Contrary to Wyrick's testimony, Plaintiffs maintain that City Dispatchers are not permitted to deviate from the TSOM, citing testimony of James Fishpaw, Defendant's Rule 30(b)(6) designee.  Fishpaw testified that City Dispatchers "need to follow the standards set forth" in the TSOM.  Nelson Decl. in Support of Mot. for Class Certification, Ex. 2, Fishpaw Decl. 72:22-24.  Although this statement differs somewhat from Wyrick's testimony, it does not establish that City Dispatchers uniformly exercised the same amount of discretion to meet the standards prescribed in the TSOM.  Further, Fishpaw testified later, like Wyrick, that the TSOM "is put forth as a guideline" and that it is not an "all-encompassing" reference.  White Decl. in Support of Def.'s Reply, Ex. 2 at 71:19-25.

Finally, Plaintiffs argue that Defendant admitted that all City Dispatchers are "production employees," apparently referring to 29 C.F.R. § 541.201(a), which states that the administrative exemption applies to an employee who performs "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service

13

establishment." Plaintiffs cite Wyrick's testimony that City Dispatchers are "front-line supervisors" who are "essential" to and "directly involved" in Defendant's business. Nelson Decl., Ex. 7, Wyrick Depo. 136:18-137:10. This testimony does not suggest, let alone establish, that City Dispatchers are akin to manufacturing production line employees or have the primary job "to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 9 (1st Cir. 1997).

Because the City Dispatchers apparently exercised varying amounts of discretion in performing their duties, Plaintiffs do not establish that the opt-in Plaintiffs are situated similarly to Hill. The record shows that City Dispatchers had disparate employment settings, which would require individual inquiries to determine whether they are subject to Defendant's exemption defenses. Accordingly, Defendant's motion for de-certification of the FLSA collective action is granted. The claims of the opt-in Plaintiffs are dismissed without prejudice. Because the collective action is de-certified, the Court need not consider Defendant's motion to exclude opt-in Plaintiffs Robert Koenegstein and Russell Weitzel from the FLSA collective action.

II. Plaintiffs' Motion for Class Certification

    A.   Legal Standard

Plaintiffs seeking to represent a class, pursuant to Federal Rule of Civil Procedure 23, must satisfy the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b). Rule 23(a) provides that a case is appropriate for certification as a class action if:

14

1  "(1) the class is so numerous that joinder of all members is
2  impracticable; (2) there are questions of law or fact common to the
3  class; (3) the claims or defenses of the representative parties are
4  typical of the claims or defenses of the class; and (4) the
5  representative parties will fairly and adequately protect the
6  interests of the class."  Fed. R. Civ. P. 23(a).
7       Rule 23(b) further provides that a case may be certified as a
8  class action only if one of the following is true:

>     (1) prosecuting separate actions by or against individual
>         class members would create a risk of:
>
>         (A) inconsistent or varying adjudications with
>             respect to individual class members that would
>             establish incompatible standards of conduct for the
>             party opposing the class; or
>
>         (B) adjudications with respect to individual class
>             members that, as a practical matter, would be
>             dispositive of the interests of the other members
>             not parties to the individual adjudications or would
>             substantially impair or impede their ability to
>             protect their interests;
>
>     (2) the party opposing the class has acted or refused to
>         act on grounds that apply generally to the class, so that
>         final injunctive relief or corresponding declaratory
>         relief is appropriate respecting the class as a whole; or
>
>     (3) the court finds that the questions of law or fact
>         common to class members predominate over any questions
>         affecting only individual members, and that a class
>         action is superior to other available methods for fairly
>         and efficiently adjudicating the controversy.  The
>         matters pertinent to these findings include:
>
>         (A) the class members' interests in individually
>             controlling the prosecution or defense of separate
>             actions;
>
>         (B) the extent and nature of any litigation
>             concerning the controversy already begun by or
>             against class members;
>
>         (C) the desirability or undesirability of
>             concentrating the litigation of the claims in the
>             particular forum; and

15

>    (D) the likely difficulties in managing a class
>        action.

Fed. R. Civ. P. 23(b).

Plaintiffs seeking class certification bear the burden of demonstrating that each element of Rule 23 is satisfied, and a district court may certify a class only if it determines that the plaintiffs have borne their burden. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 158-61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977). The court must conduct a "rigorous analysis," which may entail "looking behind the pleadings to issues overlapping with the merits of the underlying claims." Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 594 (9th Cir. 2010). In doing so, however, the court must not consider "any portion of the merits of a claim that do not overlap with the Rule 23 requirements." Id. at 594. To satisfy itself that class certification is proper, the court may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties. Id. at 589 (quoting Blackie v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975)). Ultimately, it is in the district court's discretion whether a class should be certified. Dukes, 603 F.3d at 579.

B.  Analysis

Plaintiffs move, pursuant to Rule 23(b)(3), to certify a class of California dispatchers, including City Dispatchers and "hybrid" dispatchers. In the alternative, they seek certification of separate subclasses for the two types of California dispatchers. Plaintiffs' failure to demonstrate that the opt-in FLSA Plaintiffs are situated similarly to Hill does not necessarily foreclose certification of a California class; the FLSA collective action

16

involved Defendant's City Dispatchers working throughout the United States.

Even if Plaintiffs satisfy the requirements of Rule 23(a), they fail to meet the Rule 23(b)(3) requirement that common questions of fact predominate over individual inquiries and that a class action is the superior method to adjudicate these claims.[5]

"The predominance inquiry of Rule 23(b)(3) asks whether proposed classes are sufficiently cohesive to warrant adjudication by representation. The focus is on the relationship between the common and individual issues." In re Wells Fargo Home Mortg. Overtime Pay Litig. (Wells Fargo), 571 F.3d 953, 957 (9th Cir. 2009) (internal quotation marks and citations omitted). "'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.'" Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1777 (2d ed. 1986)). "Rule 23(b)(3) requires a district court to formulate 'some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate . . . .'" Dukes, 603 F.3d at 593

---

[5] To satisfy the typicality requirement of Rule 23(a), subclasses of City Dispatchers and hybrid dispatchers would be required. Plaintiffs state that Baker, who was a "hybrid" dispatcher, is exempt from overtime pay requirements based on his loading and unloading of Defendant's trucks. See Pls.' Mot. for Class Certification 12:2-3. Thus, Baker cannot represent a class of City Dispatchers that did not perform such duties and who may be eligible for overtime pay. Conversely, Hill, who did not perform any loading or unloading, is not typical of "hybrid" dispatchers.

17

1  (quoting In re New Motor Vehicles Canadian Export Antitrust Litig.,
2  522 F.3d 6, 20 (1st Cir. 2008)).

3  Plaintiffs offer no evidence of the duties actually performed
4  by Defendant's California dispatcher employees.  Instead, they rely
5  on the same evidence detailed above: statements that all
6  dispatchers' primary job is dispatching, which appears to mean that
7  they manage and direct pickups and deliveries; Gaines's statement
8  that dispatchers are similar to McDonald's fries; Wyrick's
9  agreement with Plaintiffs' counsel that City Dispatchers perform
10 "pretty much the exact same job" in similarly sized terminals; the
11 TSOM; and testimony that dispatchers are "front line" employees.
12 However, as explained above, none of this evidence establishes that
13 City Dispatchers and "hybrid" dispatchers all perform sufficiently
14 similar duties and exercise the same level of discretion at their
15 jobs.  As above, individualized inquiries would be required to
16 determine each class member's circumstances.

17 In California, a terminal's size has a significant impact on
18 the duties assigned to a dispatcher.  Wyrick testified that at some
19 California terminals, a single dispatcher may be assigned tasks
20 that, in other terminals, are assigned to dispatchers working
21 different shifts.  Nelson Decl., Ex. 7, Wyrick Depo. 30:4-16
22 (stating that, in Benicia and San Diego, there are no positions
23 defined solely as a City Dispatcher).  For instance, in the Redding
24 terminal, Baker handled tasks assigned to City Dispatchers and
25 second- and third-shift dispatchers.  Id. at 51:19-20 (stating that
26 the supervisor position in Redding, which was held by Baker, "did
27 the inbound, did the city dispatching and did the outbound").
28 Wyrick agreed with Plaintiffs' counsel that City Dispatchers work

18

only in terminals "with a decent size workload." Id. at 132:2.

Uniform corporate policies exempting California dispatchers from overtime pay requirements and requiring them to clock in and out for work are not sufficient, on their own, to warrant class treatment. See Wells Fargo, 571 F.3d at 959 (stating that a "blanket exemption policy does nothing to facilitate common proof on the otherwise individualized issues"). More relevant to the predominance and superiority requirements are "comprehensive uniform policies detailing the job duties and responsibilities of employees." Id. Although Plaintiffs claim that the TSOM contains such policies, there is no evidence that Defendant used or enforced the TSOM in a manner that ensured uniformity among its California dispatchers, let alone that it was sufficiently comprehensive to limit significantly each dispatcher's discretion. While Wyrick referred to the TSOM as creating a "little box" within which a dispatcher could act, he also explained,

> The manual is a guideline. There are circumstances that happen every day that decisions have to be made by personnel in a location that may be different than what is actually written and stated in the manual. So when we hire people, we want to know that they can be independent strategic thinkers who can make decisions that are in the best interests, again, of our employees, our customers and our company.

Nelson Decl., Ex. 7, Wyrick Depo. 22:14-21. This description mitigates the TSOM's value with respect to predominance and superiority.

Thus, there would be multiple questions of fact related to the duties performed and amount of discretion exercised by Defendant's California dispatchers. Relevant questions would include what tasks dispatchers actually performed, such as

19

dispatching or routing; how much discretion they exercised in managing and directing pickups and deliveries; and whether they made substantial decisions without their terminal manager's consent. These individual inquiries would predominate over common questions of fact. Because such individual inquiries would prove cumbersome, a class action is not the superior method to adjudicate this lawsuit.

Accordingly, Plaintiffs' motion for class certification is denied. To the extent the Court relied on any evidence to which Defendant objected, Defendant's objections are overruled as moot. In addition, Defendant's motion to strike paragraphs of the Nelson Declaration is denied as moot.

## CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' motion for class certification (Docket No. 236) and GRANTS Defendant's motion to de-certify the conditionally certified FLSA collective action (Docket No. 249). The claims of the opt-in Plaintiffs are dismissed without prejudice. The Court DENIES as moot Defendant's motions to exclude (Docket No. 231) and to strike (Docket No. 270).

A further case management conference will be held on April 5, 2011 at 2:00 p.m. The parties shall file their joint case management conference statement by March 29, 2011.

IT IS SO ORDERED.

Dated: 3/3/2011

CLAUDIA WILKEN
United States District Judge

20